Filed 12/17/19

<u>**CERTIFIED FOR PARTIAL PUBLICATION**</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>              v.<br><br>KIMBERLY DAISY RAMIREZ,<br><br>    Defendant and Appellant. | F076911<br><br>(Super. Ct. No. CRF51684)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tuolumne County.  Kevin M. Seibert, Judge.

Joshua L. Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Lewis A. Martinez and Ian Whitney, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Kimberly Daisy Ramirez was convicted by a jury of several offenses stemming from a sexual relationship she had with a 16-year-old boy, namely:  three counts of unlawful sexual intercourse with a minor, and one count each of oral copulation

---

* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I, II, III and V of the Discussion.

with a minor, contacting a minor with the intent to commit a sexual offense, arranging a meeting with a minor for lewd purposes, and meeting with a minor for lewd purposes.

She raises five contentions on appeal: (1) The prosecutor committed prejudicial misconduct by misstating the burden of proof during closing argument; (2) the trial court prejudicially erred by giving conflicting jury instructions on the element of motive for two of the crimes; (3) even if individually insufficient to warrant reversal, the cumulative effect of the errors in claims (1) and (2) requires reversal; (4) her conviction for arranging a meeting with a minor for lewd purposes should be reversed as a lesser included offense of meeting with a minor for lewd purposes; and (5) the sentences imposed in three of the counts should be stayed under Penal Code section 654.[1]

We agree with Ramirez's fourth and fifth contentions only. We accordingly reverse her conviction for arranging a meeting with a minor for lewd purposes, and remand for resentencing. On remand, the trial court shall stay the imposition of sentence on her convictions for contacting a minor for lewd purposes and meeting with a minor for lewd purposes.[2] In all other respects, we affirm.

## STATEMENT OF THE CASE

On December 16, 2016, the Tuolumne County District Attorney filed an information charging Ramirez with 10 counts of unlawful sexual intercourse with a minor (§ 261.5, subd. (c); counts 1-10); sodomy with a minor (§ 286, subd. (b)(1); count 11), oral copulation with a minor (§ 288a, subd. (b)(1)); count 12); contacting a minor with intent to commit a sexual offense (§ 288.3, subd. (a); count 13); meeting with a minor for lewd purposes (§ 288.4, subd. (b); count 14); and arranging a meeting with a minor for lewd purposes (§ 288.4, subd. (a); count 15).

---

[1] Undesignated statutory references are to the Penal Code.

[2] The conviction for arranging a meeting with a minor for lewd purposes would be the third sentence stayed under section 654 but for the fact it is otherwise being reversed as a lesser included offense.

The jury found Ramirez guilty on counts 5, 6, 10, and 12 through 15. The jury found Ramirez not guilty on counts 7, 9, and 11. The prosecution did not submit counts 1 through 4 or count 8 to the jury, and those counts were dismissed following the verdict.

On November 29, 2017, Ramirez was sentenced to an aggregate term of six years in state prison as follows: three years on count 14 (the principal term for sentencing purposes), eight months on count 5, eight months on count 6, eight months on count 10, eight months on count 12, and four months on count 13. She was also sentenced to a term of 180 days on count 15 to run concurrently with the term on count 14.

On January 25, 2018, Ramirez filed a timely notice of appeal.

## FACTS

**Prosecution's Evidence**

In June 2016, 16-year-old John Doe moved to Sonora with his mother, E.N.[3] They initially moved in with family friends, then moved into a house of their own in August 2016. Doe's parents had recently divorced, and the divorce negatively impacted him; he was struggling with depression, had experienced thoughts of suicide, and had been receiving counseling. Doe had been home schooled and told his mother he would prefer to remain home schooled rather than enroll in the local high school.

In the summer of 2016, Doe got an iPhone. Around August 15, 2016,[4] Doe downloaded an application called "Whisper," a social media platform that allows users to communicate anonymously. He started communicating with several "random people" on the app on August 15, including Ramirez. Although he was only 16 years old, he told people he communicated with on Whisper he was 17.

Doe and Ramirez communicated for approximately three hours that day on Whisper. Doe told Ramirez he was 17, and Ramirez told Doe she was 38. The

---

[3] John Doe was 16 years old at the time of the crimes.

[4] References to dates are in 2016 unless otherwise noted.

3.

conversation became sexual after the first hour and they began exchanging nude photographs of each other. Ramirez suggested they continue their conversation on a different app called "Snapchat," which is a social media platform that allows users to exchange messages and photographs.

During the conversation, Ramirez suggested Doe come over to her residence that night to have sex and sent him her address. Doe told his mother he was going out for a run. Towards the end of his run, he went to Ramirez's apartment, which was close to his house.

Doe knocked on Ramirez's door, and she let him in and led him to her bedroom. They sat on Ramirez's bed and talked for a while. Ramirez said she had two sons, one of whom was home in his bedroom and had just built a new computer. Ramirez also said she was a corrections officer at the prison, and that she recognized the sweatshirt Doe was wearing, which was for the shooting team he was on. She said she worked with one of the team's coaches who also worked at the prison.

After about 20 minutes, Ramirez and Doe began kissing and "grabbing" each other. They then took their clothes off and Ramirez orally copulated Doe and had vaginal intercourse with him. After they finished, Doe put his clothes back on and went home. Doe and Ramirez exchanged messages later that night and joked about Doe not being a virgin anymore. Doe went to Ramirez's apartment again the next evening where Ramirez orally copulated him and had intercourse with him again.

Between August 15 and October 31, Ramirez and Doe had sex between 10 and 15 times. Ramirez's son was home about five of those times. Doe and Ramirez also watched pornography together on Ramirez's phone about three times. They continued to exchange messages and photographs—Doe sent Ramirez sexual photographs, and Ramirez sent him videos of her masturbating. Once while they were having sex, Ramirez's son knocked on the bedroom door and asked about dinner, and she told him it

4.

was in the refrigerator and then continued having sex with Doe. Another time, Doe's mother texted him while Ramirez and he were having sex.

Two or three times, Ramirez and Doe discussed how what they were doing was illegal because Doe was a minor. Ramirez said she could get into a lot of trouble if anyone found out. Ramirez one time told Doe that she could be his "birthday present" when he turned 18.

Doe started ignoring Ramirez when he started school in early September 2016 but eventually reinitiated contact with her. He only saw her once or twice after that, including the last time, which was on the evening of October 31.

Around this time period, E.N. noticed Doe had apparently taken a new interest in running, as he would go out running each morning and then would often run again in the evening. However, E.N. grew suspicious as this amount of running seemed excessive to her. She eventually told Doe he could not run anymore without a running partner. E.N. also attended night classes on Mondays and Wednesdays from 6:00 p.m. to 9:00 p.m, and she began dropping Doe off at the home of family friends on her way to class due to her mistrust. Doe's best friend, Steven, lived at this house.

On October 31, E.N. dropped Doe off at Steven's house. E.N. told Steven's mother that Doe had been disappearing. Doe contacted Ramirez that evening and asked if he could come over. Ramirez said he could come over once her son was in his room. Once Doe got the message from Ramirez that he could come over, Doe left his phone and house keys with Steven and went to Ramirez's apartment and had sex with her.

Meanwhile, E.N. arrived at her class and learned it had been canceled, so she went home. While she was home, Steven walked into her house alone. E.N. asked Steven where Doe was, and Steven said Doe went jogging. Steven said his mother dropped him and Doe off at Doe's house, and Doe gave his cell phone and house keys to Steven. E.N. was suspicious. She drove around Doe's usual running route but could not find him. She returned home, took Doe's phone from Steven, and saw a message from a person named

5.

"Kimmy" that said, "The kids are gone, you can come over." She sent a message with Doe's phone to "Kimmy" asking, "Where is my son?" She told Steven to get in the car with her and Steven directed her to the apartment complex where Doe had said he was going.

Ramirez saw the message from Doe's mother while Doe was still in her apartment. She asked Doe if the message was from Doe's mother or his friend, and Doe said he did not know. This is when Ramirez said, "I could get in a lot of trouble for this." Doe left and began running home. When he was about half way, he saw his mother driving with Steven in the car. Doe got in the car and eventually admitted he had been having sex with a 38-year-old woman.

E.N. went to Ramirez's apartment complex and tried unsuccessfully to locate her before calling the police. An officer arrived and spoke with Doe and E.N. Doe described Ramirez's height, hair color, and two of her tattoos. Doe said Ramirez had a third tattoo, but he could not describe it. He never mentioned Ramirez having a scar. Doe then led the officer to Ramirez's apartment. The officer made contact with Ramirez after Doe left the scene.

The officer testified Ramirez was "visibly nervous" when answering questions and at times seemed at a loss for an answer. Ramirez told the officer she did not know anyone with Doe's name or matching his description. When asked if she had recently had sex with anyone, she said she had been conversing with three different men online and had recently had sex with only one of them but denied any of these men matched Doe's description. Ramirez had tattoos matching what Doe had described. Ramirez was placed under arrest.

The officer conducted a second interview with Doe the next day. While Doe originally told the officer on October 31 that he had started having sex with Ramirez in June, he later said it started in August. The officer also had Doe draw a crude map of

6.

Ramirez's apartment, which the officer later testified was generally accurate.[5] The officer went to Ramirez's apartment a day or two later to take pictures and seize her cell phone. Ramirez's phone had the Whisper app installed.

The officer reviewed Doe's phone and saw messages exchanged in August 2016 between Doe and someone named "Kimmy." The officer took photographs of these messages, and Doe later testified these messages were between him and Ramirez. Doe estimated these messages comprised about 60 percent of the messages he had exchanged with Ramirez.

In these messages, Doe told Ramirez, "I do have a mom and it's going to be interesting." Ramirez messaged Doe, "Here is my address," followed by the address where the officer contacted Ramirez on October 31. Later, Ramirez messaged Doe, "I think you want to do everything." Doe responded, "We did." Ramirez replied, "Maybe too much too soon." After that, Doe said, "Your ass was too tight." Ramirez said, "If you're going to fuck my ass, we need lubricant and you have to go slow."

Police obtained a search warrant for Doe's Snapchat account. The information received from Snapchat showed 30 logged communications between Doe's account and an account named "Kim.daisy78." These communications occurred between October 27 and November 1, 2016 UTC (Coordinated Universal Time).

**Defense Evidence**

Ramirez testified in her own defense and denied having sex with Doe. She had recently been divorced and had been using dating apps but did not recognize Doe from any photographs she had ever exchanged and did not remember interacting with him. She was having a sexual relationship with a 25-year-old man named Kevin, but never had a man over for sex while her son was home.

---

[5] At trial, Doe drew another diagram of her apartment that was more consistent with how he remembered her apartment.

Ramirez testified she had an IUD implanted into her uterus on October 9, which caused pain and heavy bleeding that prevented her from having sex for a month following the procedure.

Ramirez had a total of five tattoos, a few of which would be visible depending on what type of clothing she was wearing, as well as a two-inch long scar on her labia.

Ramirez worked as a corrections officer at a prison about a half hour drive from her home. She said she had been working extra shifts two or three times per week between August and November 2016. Her work schedule showing the hours she had worked during this period was admitted into evidence.

She explained the diagram Doe drew of her apartment was not accurate as it was missing one of the rooms. She also said she had posted on her Facebook page about her son building a computer.

She testified she no longer locked her apartment because one time she accidentally locked her son out. She also had sometimes used the swimming pool at her apartment complex, during which times her tattoos would have been visible.

Ramirez's 13-year-old son also testified on her behalf. He testified he had never seen Doe before and said he had never seen his mother bring any men home and had never heard his mother having sex.

**Prosecution's Rebuttal**

The arresting officer testified that when he was driving Ramirez to jail, Ramirez spontaneously said, "What if he's lying? Will he get in trouble?" She also said, "What if I didn't know his age?" And she said, "What if he lied to me?"

## DISCUSSION

### I.   Prosecutorial Error

Ramirez contends the prosecutor committed prejudicial misconduct by misstating the burden of proof during rebuttal closing argument. Specifically, Ramirez contends the prosecutor erroneously conflated the concept of rejecting unreasonable inferences with

8.

the reasonable doubt burden of proof, and suggested the jury could find defendant guilty based on a mere reasonable account of the evidence. We disagree the prosecutor committed misconduct.

## A.      Factual Background

### 1.      Instructions

The court read instructions to the jury after both parties rested but prior to closing arguments, and advised the jury it would receive copies of all instructions in the jury room. One of the first instructions was CALCRIM No. 200, which reads, in part: "You must follow the law as I explain it to you, even if you disagree with it. If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions."

The court also read CALCRIM No. 220 on reasonable doubt:

> "The fact that a criminal charge has been filed against the defendant is not evidence that the charge is true. You must not be biased against the defendant Kimberly Daisy Ramirez just because she has been arrested, charged with a crime, or brought to trial.

> "A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. *Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt.*

> "*Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt, because everything in life is open to some possible or imaginary doubt.*

> "In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the defendant guilty beyond a reasonable doubt, she is entitled to an acquittal, and you must find her not guilty." (Italics added.)

The court also read CALCRIM No. 224 on circumstantial evidence:

"Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt.

"Also, before you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty. If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

### 2.      Defense Counsel's Closing Argument[6]

Defense counsel argued to the jury regarding the instruction on circumstantial evidence:

"If there are two conclusions you can reach when you're given evidence – circumstantial evidence, if there are two things you can conclude with that evidence and one points to guilt and one points to innocence, you have to accept the one that points to innocence. You're not allowed to pick the one that points to guilt. That's what the law says. That's the instruction on circumstantial evidence.

"That's because of the nature of circumstantial evidence. It's not direct. It could be good evidence, but it's not as reliable as direct, and if you can look at it two ways, our system says you have to give the benefit of the doubt to the person who will be convicted of a felony if you look at it wrong."

### 3.      Prosecutor's Rebuttal Closing Argument

On rebuttal, the prosecutor responded to defense counsel's argument regarding circumstantial evidence as follows:

"Now, [defense counsel] talked about how he gave you an instruction about how if there's two interpretations, you have to go with the

---

[6] The prosecution's initial closing argument is not at issue.

one that points to his client's innocence. He probably accidentally forgot this word, but it's kind of a huge word, 'if' you can draw two or more reasonable conclusions, forgot to mention that part. Two or more reasonable conclusions, one for her innocence and one for her guilt, you go for the one that points to her innocence. But that word 'reasonable' that he left out is huge here because her story, if you choose to believe it, is that out of the blue John Doe fabricates all of this information, fabricates her address, makes sure that the little tattoo symbol – I guess it's not a rose or whatever, looks exactly like the tattoo, fabricates all this stuff, and does it just to get mad at his mom, and he has to come in here and testify about horrible things. I can go on for hours.  [¶] … [¶]

"The things here that [defense counsel's] asking you to believe the kid made up to get back at his mom, just to protect somebody else that he happens to be having sex with somebody in the same apartment complex he's going to these lengths, is this the John Doe that you saw there? Because the conclusions have to be reasonable conclusions, reasonable, intelligent, make sense, and they don't make sense at all.  [¶] … [¶]

"But the fact of the matter is, this is the evidence in the case, and the evidence points to her, and there's only one reasonable interpretation.  That other one that she's innocent, knows nothing, why she said that to [the arresting officer] on the way to the jail about, maybe he was lying, that's not a reasonable interpretation.  That's - - that's not reasonable.  [¶] … [¶]

"Your job is not to go down unreasonable hallways, don't go unreasonable, because reasonable is part of the word doubt too.  You have doubts, they better be reasonable doubts, not kind of wild, kind of crazy, what if.  What if this kid is such a genius that he can come up with addresses and tattoos and everything else and work schedules?  Wow.  That's not reasonable.  That's kind of going into—into crazy world.

"So if you stay with reasonable, there's only one interpretation, her guilt.  Be fair.  Hold her accountable and find her guilty."

## B.      Forfeiture and Ineffective Assistance of Counsel

" 'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.' " (*People v. Winbush* (2017) 2 Cal.5th 402, 481.)  The People contend, and we agree, Ramirez forfeited her claim of prosecutorial error by failing to make a timely

11.

objection. There is nothing in the record to indicate an objection would have been futile or that the prosecutor's argument was "so extreme or pervasive that a prompt objection and admonition would not have cured the harm." (*People v. Centeno* (2014) 60 Cal.4th 659, 674 (*Centeno*).) Accordingly, we analyze defendant's argument that defense counsel's failure to object constituted ineffective assistance of counsel.

To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) objectively deficient performance by her counsel and (2) resulting prejudice. (*Centeno, supra,* 60 Cal.4th at p. 674.) While we presume counsel's performance fell within a wide range of professional competence and sound trial strategy, counsel is deficient if there is no conceivable tactical purpose for the failure to object. (*Id.* at pp. 674–675.) Prejudice is not shown unless there is a " 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " (*Id.* at p. 676.) Because the decision whether to object to a prosecutor's comments during closing argument is highly tactical, " 'a mere failure to object to evidence or argument seldom establishes counsel's incompetence.' " (*Id.* at p. 675.)

As we will explain, the prosecutor's comments were not improper. Because we find the prosecutor's comments were not objectionable, defense counsel's failure to object to them did not constitute deficient performance. Ramirez was not, therefore, deprived of her right to effective assistance of counsel.

### C. The Merits

#### 1. Applicable Law

"Advocates are given significant leeway in discussing the legal and factual merits of a case during argument. [Citation.] However, 'it is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its … obligation to overcome reasonable doubt on all elements [citation].' [Citations.] To establish such error, bad faith on the prosecutor's part is not required." (*Centeno, supra,* 60 Cal.4th at p. 666.)

12.

"When attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*Centeno, supra,* 60 Cal.4th at p. 667.)

A prosecutor's conduct violates the federal Constitution when the conduct " 'infects the trial with such unfairness as to make the conviction a denial of due process' "; that is, when the conduct is " 'of sufficient significance to result in the denial of the defendant's right to a fair trial.' " (*People v. Harrison* (2005) 35 Cal.4th 208, 242.) A prosecutor's argument that does not render a criminal trial fundamentally unfair violates California law only if the conduct involves " ' " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' " (*Ibid.*)

"While a prosecutor may appeal to the jurors to use their common sense, experience, and reason to evaluate the evidence and assess witness credibility, a prosecutor may not argue or even suggest the prosecution's burden of proof is satisfied if the prosecution's evidence presents a reasonable account. [Citation.] A prosecutor may argue that defense interpretations of the evidence are unreasonable, but may not argue that deficiencies in the defense evidence can make up for shortcomings in the prosecution's case. [Citation.] The prosecutor may not 'confound[ ] the concept of rejecting unreasonable inferences with the standard of proof beyond a reasonable doubt.' " (*People v. Meneses* (2019) 41 Cal.App.5th 63, 71–72.)

However, a prosecutor may argue "reasonably possible interpretations to be drawn from the evidence." (*Centeno, supra,* 60 Cal.4th at p. 672.) "It is permissible to argue that the jury may reject impossible or unreasonable interpretations of the evidence and to so characterize a defense theory." (*Ibid.*) The prosecutor may "urge the jury to ' "accept

the reasonable and reject the unreasonable" ' in evaluating the evidence before it." (*Id.* at p. 673.)

### 2. Analysis

In evaluating the propriety of closing arguments, we "must [consider the challenged] statements in the context of the argument as a whole" to make our determination. (*People v. Cole* (2004) 33 Cal.4th 1158, 1203.) The context here is the inferences to be drawn from circumstantial evidence. Defense counsel argued during closing argument that the jury cannot convict Ramirez if there are two interpretations of the circumstantial evidence and one points to her innocence. During rebuttal closing argument, the prosecutor clarified that the jury may rely on an interpretation of the circumstantial evidence pointing to innocence only if the interpretation is *reasonable*. The prosecutor proceeded to argue there was only one reasonable interpretation of the evidence—Ramirez's guilt, and that the jury should not entertain unreasonable interpretations of the evidence.

In context, it is clear the prosecutor's comments were made in reference to the inferences that can be drawn from circumstantial evidence. In urging the jury to adopt the reasonable inferences and reject the unreasonable, the prosecutor was not discussing the beyond a reasonable doubt standard of proof that the prosecutor was required to meet. The prosecutor did not commit misconduct.

Ramirez's attempt to liken her case to that of *Centeno, supra,* 60 Cal.4th 659 is unavailing. The prosecutor in *Centeno* had argued: " 'Is it reasonable to believe that a shy, scared child who can't even name the body parts made up an embarrassing, humiliating sexual abuse, came and testified to this in a room full of strangers *or the defendant abused Jane Doe. That is what is reasonable, that he abused her.* [¶] Is it reasonable to believe that Jane Doe is lying to set-up the defendant for no reason or is the defendant guilty?' … 'Is it reasonable to believe that there is an innocent explanation for a grown man laying on a seven year old? No, that is not reasonable. Is it reasonable to

14.

believe that there is an innocent explanation for the defendant taking his penis out of his pants when he's on top of a seven-year-old child? No, that is not reasonable. Is it reasonable to believe that the defendant is being set-up in what is really a very unsophisticated conspiracy led by an officer who has never met the defendant *or he['s] good for it? That is what is reasonable. He's good for it.*' " (*Id.* at pp. 671-672, original italics.)

The Supreme Court concluded the italicized parts of the prosecutor's argument misstated the burden of proof because they "left the jury with the impression that so long as [the prosecutor's] interpretation of the evidence was reasonable, the People had met their burden." (*Centeno, supra,* 60 Cal.4th at p. 672.) As opposed to simply urging the jury to accept reasonable interpretations of the evidence and reject unreasonable interpretations, "[the prosecutor] confounded the concept of rejecting unreasonable inferences, with the standard of proof beyond a reasonable doubt. She repeatedly suggested that the jury could *find defendant guilty* based on a 'reasonable' account of the evidence. These remarks clearly diluted the People's burden." (*Id.* at p. 673.) The prosecutor's comments in Ramirez's case did not dilute the prosecution's burden like the comments found in *Centeno*.

In any event, any alleged error was not prejudicial. First, the evidence of Ramirez's guilt on the charges she was convicted of was overwhelming, despite her arguments to the contrary. Doe positively identified Ramirez in court and testified in detail about how his relationship with Ramirez started and developed, as well as the various sexual acts they engaged in. Doe knew exactly which apartment she lived in, described her tattoos, knew she had a son who had just built a computer, knew she worked at a prison, and knew she worked with his shooting coach. A search of Doe's phone records revealed messages from a person named "Kimmy" and communications with a person with the screenname "Kim.daisy78." Ramirez's spontaneous statements while being transported to jail were also quite incriminating. It strains credulity to think

15.

that Doe learned so much about Ramirez without having met her and fabricated every aspect of their sexual relationship.

Secondly, even if the jury was at all misled by the prosecution's comments, which is doubtful, we are confident the court's instructions put the jury back on course. The jury was instructed with CALCRIM Nos. 220 and 224 regarding the reasonable doubt standard and circumstantial evidence, respectively. The trial court also "admonished the jurors ... that they were required to follow the law and base their decision solely on the law and instructions as given to them *by the court*. [CALCRIM No. 200.] Those admonishments were sufficient to dispel any potential confusion raised by the prosecutor's argument. No basis for reversal appears." (*People v. Barnett* (1998) 17 Cal.4th 1044, 1157.)

## II.     Proof of Motive

Ramirez contends her convictions in counts 14 and 15 must be reversed because the trial court prejudicially erred by giving conflicting instructions on the motive element of those crimes. The People agree the trial court committed instructional error, but contend Ramirez did not suffer prejudice necessitating reversal. We agree with the People.

### A.     Background

Count 14 charged Ramirez with meeting with a minor for lewd purposes (§ 288.4, subd. (b)) and count 15 charged her with arranging a meeting with a minor for lewd purposes (§ 288.4, subd. (a)). The trial court instructed the jury with CALCRIM No. 1126 for count 14 and with CALCRIM No. 1125 for count 15, which are the pattern jury instructions for those respective charges. Both of those instructions required the prosecutor to prove that defendant "was motivated by an unnatural or abnormal sexual interest in children."

16.

The trial court also instructed the jury with CALCRIM No. 370, the pattern instruction regarding motive. That instruction informed the jury that the prosecutor was "not required to prove that the defendant had a motive to commit the charged crimes."

During closing arguments, the prosecutor said to the jury: "So why would a 38-year-old woman have sex with a minor? There's an instruction on motive. Don't know. Don't care, but anybody who has eyeballs and has read the paper or turns on the TV, sure does happen, and it happened here, and she did it."

## B. The Trial Court Erred

Ramirez contends, and the People concede, the trial court committed instructional error by giving the conflicting instructions on motive. "Motive is not generally an element of a criminal offense. But when it *is* an element, the trial court errs by giving an unmodified version of CALCRIM No. 370 …." (*People v. Valenti* (2016) 243 Cal.App.4th 1140, 1165 (*Valenti*).) Motive is an element of section 288.4, subdivisions (a)(1) and (b). To convict Ramirez of those crimes, the jury had to find she was "motivated by an unnatural or abnormal sexual interest in children." (§ 288.4, subds. (a)(1) & (b).) The trial court should have modified CALCRIM No. 370 to specify that it was inapplicable to the crimes charged in counts 14 and 15.

## C. Ramirez Did Not Suffer Prejudice

The parties agree the instructional error here must be reviewed for prejudice under the "harmless beyond a reasonable doubt" standard articulated in *People v. Chapman* (1967) 386 U.S. 18, 24 (*Chapman*). We use the particularized *Chapman* analysis employed by the United States Supreme Court in *Neder v. United States* (1999) 527 U.S. 1 (*Neder*) to determine whether Ramirez suffered prejudice necessitating reversal. (See *Valenti, supra,* 243 Cal.App.4th at pp. 1165–1167 [treating conflicting instructions on motive as "a failure to instruct on an element of the offense" and applying *Neder* analysis to the error].)

17.

When the trial court's instructions omit an element of an offense, the question under *Neder* is whether it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error[.]" (*Neder, supra,* 527 U.S. at p. 18.) *Neder* held that "where a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless." (*Id.* at p. 17.)

The evidence supporting the motive element was uncontested. Ramirez's theory at trial was solely that she was not the perpetrator. She did not contest that the perpetrator, whoever she was, committed the crimes charged in counts 14 and 15 with the requisite motive. However, the jury resolved the issue of the perpetrator's identity in the prosecution's favor when it found Ramirez was the perpetrator in all of the other counts, including the three counts of unlawful sexual intercourse with a minor.

The essential, uncontested facts regarding the motive element were: Doe met a woman through an app called Whisper. He told the woman he was 17 and the woman told him she was 38. The two communicated for several hours and at some point began sending sexually explicit messages and photographs to each other. They eventually arranged to meet at her home that evening for sex. The woman sent him her apartment address and he went to the apartment that evening and had sex with her as planned. Again, Ramirez did not contest any of this happened between Doe and a woman; she only denied it was her. Most critically, she did not contest that Doe was a minor. We therefore conclude the motive element was uncontested.

Overwhelming evidence supported the motive element of counts 14 and 15 as well. A defendant is guilty of violating section 288.4, subdivisions (a)(1) and (b) only if she was "motivated by an unnatural or abnormal sexual interest in children." This motive element is satisfied by any sexual interest in a child "because there can be no *normal* sexual interest in any child," particularly when the perpetrator is more than 20 years older

18.

than the child.  (*People v. Shaw* (2009) 177 Cal.App.4th 92, 103.)  Overwhelming evidence demonstrated Ramirez was motivated by sexual interest in a child when she arranged to meet, and subsequently met, Doe on August 15, 2016 for sex.  The evidence shows Doe told Ramirez he was a minor very early in their conversations that day. Despite knowing Doe's age, the evidence shows Ramirez proceeded to exchange sexually explicit photographs with Doe and eventually sent him her address so Doe could come over to have sex, which they did.  On this evidentiary record, we conclude the motive element of counts 14 and 15 was supported by overwhelming evidence.

Ramirez characterizes the evidence as far from overwhelming, arguing that "the jury must not have believed the entirety of Doe's allegations, because otherwise the jury would not have acquitted on counts seven, nine, and 11."  Counts 7 and 9 were charges of unlawful sexual intercourse with a minor that occurred on different days, and count 11 was a charge of sodomy with a minor.  That the jury did not believe there was enough evidence to convict on every one of the many charged offenses does not mean the jury necessarily regarded Doe as generally dishonest.  Furthermore, it is possible for there to be insufficient evidence of certain crimes—for which the jury acquits—as well as overwhelming evidence of other crimes—for which the jury convicts.

Ramirez also points to her trial testimony where she explained she had been using dating apps to meet and chat with adult men.  She suggests there is evidence in the record that could have supported a finding that she was only seeking adult men and was not sexually interested in children.  This misses the mark and ignores the compelling evidence we have previously discussed.  Even assuming Ramirez was initially only seeking adult men on these apps, the evidence is overwhelming she eventually met Doe, learned he was reportedly 17, and subsequently arranged to meet with him for sex.  This is the crucial and uncontroverted fact.

In light of the aforementioned circumstances, we are convinced beyond a reasonable doubt the motive element of counts 14 and 15 was uncontested and supported

by overwhelming evidence, such that the verdict would have been the same absent the instructional error.  Reversal of counts 14 and 15[7] is therefore unwarranted on this ground.

## III.    Cumulative Error

Ramirez contends the cumulative effect of her first two claims of error was to deprive her of her right to a fair trial.  "A predicate to a claim of cumulative error is a finding of error.  There can be no cumulative error if the challenged rulings were not erroneous." (*People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1068.)  Since we find no merit in her first two claims of error, we in turn find no cumulative error.

## IV.    Lesser Included Offense

Ramirez argues her conviction for arranging a meeting with a minor for lewd purposes under section 288.4, subdivision (a) (count 15) must be reversed because it is a lesser included offense of the crime of meeting with a minor for lewd purposes under section 288.4, subdivision (b) (count 14).  The People concede, and we agree.

A defendant cannot be convicted of both a greater offense and a lesser included offense.  (*People v. Reed* (2006) 38 Cal.4th 1224, 1227 (*Reed*); *People v. Cole* (1982) 31 Cal.3d 568, 582.)  "Under California law, a lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser." (*People v. Birks* (1998) 19 Cal.4th 108, 117.)  In deciding whether a defendant may be convicted of multiple charged crimes, courts use only the "statutory elements test;" the "accusatory pleading test" is not applicable in this context.  (*Reed,* at p. 1231.)

Section 288.4, subdivision (a)(1) provides:

---

[7] As explained in section IV of our discussion, we reverse Ramirez's conviction in count 15 as a lesser included offense of count 14.

20.

"Every person who, motivated by an unnatural or abnormal sexual interest in children, arranges a meeting with a minor or a person he or she believes to be a minor for the purpose of exposing his or her genitals or pubic or rectal area, having the child expose his or her genitals or pubic or rectal area, or engaging in lewd or lascivious behavior, shall be punished by a fine not exceeding five thousand dollars ($5,000), by imprisonment in a county jail not exceeding one year, or by both the fine and imprisonment."

Section 288.4, subdivision (b) provides:

"Every person described in paragraph (1) of subdivision (a) who goes to the arranged meeting place at or about the arranged time, shall be punished by imprisonment in the state prison for two, three, or four years."

As the parties acknowledge, subdivision (b) incorporates all of the elements of subdivision (a)(1), and therefore a person who violates subdivision (b) necessarily violates subdivision (a)(1) as well. Thus, subdivision (a)(1) is necessarily an included offense of subdivision (b).

## A. CALCRIM No. 1126

We publish this section IV of our discussion to clarify a point of uncertainty presently found in the bench notes of CALCRIM No. 1126, which is the instruction given for charged violations of section 288.4, subdivision (b). The bench notes observe:

"It is unclear how violations of Pen. Code, § 288.4(b), which involve actually going to an arranged meeting, correlate to violations of Pen. Code, § 288.4(a) (cf. CALCRIM No. 1125, Arranging Meeting With Minor for Lewd Purpose). Violations of section 288.4(a) may be lesser included offenses of violations of section 288.4(b). In the alternative, a violation of section 288.4(b) could be characterized as sentence enhancement of a violation of section 288.4(a). This matter must be left to the trial court's discretion until courts of review provide guidance."

We conclude violations of section 288.4, subdivision (b) are not sentence enhancements of violations of section 288.4, subdivision (a), but rather that violations of section 288.4, subdivision (a) are lesser included offenses of violations of section 288.4, subdivision (b).

21.

By definition, "[a] sentence enhancement is 'an *additional term* of imprisonment added to the base term.' [Citation.] An example would be subdivision (a) of section 12022.7, which provides that any person who personally inflicts great bodily in the commission of a felony shall 'be punished by an *additional term* of three years ….' (Italics added.) As this court has explained, enhancements ' "focus on an element of the commission of the crime or the criminal history of the defendant which is not present for all such crimes and perpetrators and which justifies a higher penalty than that prescribed for the offenses themselves." ' " (*People v. Jefferson* (1999) 21 Cal.4th 86, 101.)

As Ramirez observes, section 288.4, subdivision (b) makes no reference to the sentence provided in subdivision (a)(1). For example, subdivision (b) does not provide for an *additional* term of imprisonment if the defendant goes to the arranged meeting place at or about the arranged time. Rather, violators of subdivision (b) are sentenced under a triad—two, three, or four years in state prison—that is independent of the possible sentence for violation of subdivision (a)(1)—imprisonment in county jail for up to one year, a fine, or both the fine and imprisonment. We hold that a violation of section 288.4, subdivision (a) is a lesser included offense of section 288.4, subdivision (b).

## V.    Section 654

At sentencing, the trial court imposed terms of imprisonment on each of counts 13, 14, and 15. Count 14 was also designated the "principal term." Ramirez argues the sentences imposed on counts 13, 14, and 15 must be stayed under section 654 because those counts were incidental to her convictions for unlawful sexual intercourse with a minor.[8] Again, the People concede, and we agree.

---

[8] As we are reversing Ramirez's conviction on count 15 as a lesser included offense of count 14, count 15 is excluded from our analysis on this issue.

22.

### A. Background

Section 654 provides, in relevant part, "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." The statute "expressly prohibits separate punishment for two crimes based on the same act, but has been interpreted to also preclude multiple punishment for two or more crimes occurring within the same course of conduct pursuant to a single intent." (*People v. Vargas* (2014) 59 Cal.4th 635, 642; accord, *People v. Harrison* (1989) 48 Cal.3d 321, 335.) "If all of the offenses are incident to one objective, the court may punish the defendant for any one of the offenses, but not more than one. [Citation.] If, however, the defendant had multiple or simultaneous objectives, independent of and not merely incidental to each other, the defendant may be punished for each violation committed in pursuit of each objective even though the violations share common acts or were parts of an otherwise indivisible course of conduct." (*People v. Cleveland* (2001) 87 Cal.App.4th 263, 267–268 (*Cleveland*.)

"The question whether section 654 is factually applicable to a given series of offenses is for the trial court, and the law gives the trial court broad latitude in making this determination. Its findings on this question must be upheld on appeal if there is any substantial evidence to support them." (*People v. Hutchins* (2001) 90 Cal.App.4th 1308, 1312.) Under substantial evidence review, we review the evidence in the light most favorable to the judgment and presume the existence of every fact that could reasonably be deduced from the evidence. (*Cleveland, supra,* 87 Cal.App.4th at p. 271.) We "affirm the trial court's ruling, if it is supported by substantial evidence, on any valid ground." (*People v. Capistrano* (2014) 59 Cal.4th 830, 886, fn. 14, overruled in part on another ground in *People v. Hardy* (2018) 5 Cal.5th 56, 103–104; accord, *People v. Brents* (2012) 53 Cal.4th 599, 618.)

**B.     Analysis**

In sex crimes cases, multiple offenses are generally considered divisible and subject to separate punishment, even when committed on the same occasion and pursuant to the same intent.  (*People v. Alvarez* (2009) 178 Cal.App.4th 999, 1006.)  However, section 654 nevertheless applies when one sex offense is merely incidental to another offense.  (*Ibid.*)

Ramirez finds support in *People v. Medelez* (2016) 2 Cal.App.5th 659 (*Medelez*).  The defendant in that case was separately convicted of attempted oral copulation and contacting a minor for lewd purposes (§ 288.3), and the trial court imposed separate sentences without staying either.  (*Medelez,* at p. 663.)  The Court of Appeal reversed, concluding the defendant could not be punished for both offenses because they were "based on a single intent and objective."  (*Ibid.*)  Here, the evidence shows that Ramirez acted with the single intent and objective to have sexual relations with Doe, namely sexual intercourse and oral copulation, and that her convictions on counts 13, 14, and 15 were merely incidental to her accomplishing that intent and objective.  The record is devoid of any evidence Ramirez ever harbored multiple intents and objectives.  Therefore, the trial court's implied finding Ramirez harbored multiple intents and objectives is not supported by substantial evidence.  On remand, her sentences on counts 13 and 14 must be stayed.

## **DISPOSITION**

The conviction on count 15 is reversed as a lesser included offense of count 14. The matter is remanded for resentencing. On remand, the trial court is to choose a new principal term and stay the sentences on counts 13 and 14 under section 654. In all other respects, the judgment is affirmed.

_____

SNAUFFER, J.

WE CONCUR:

_____

FRANSON, Acting P.J.

_____

MEEHAN, J.

25.